

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/8/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGAN WOOD d/b/a REGAN WOOD PHOTOGRAPHY,

                 Plaintiff,

- against -

OBERSERVER HOLDINGS, LLC; ACB ASSOCIATES, L.P.; THE NEW YORK OBSERVER, LLC; and OBSERVER MEDIA DIGITAL, LLC,

                 Defendants.

20 Civ. 07878 (LLS)

OPINION & ORDER

Plaintiff Regan Wood d/b/a Regan Wood Photography ("Wood") brings claims for direct copyright infringement and for violations of Section 1202 of the U.S. Copyright Act.

Defendants Observer Holdings, LLC and The New York Observer, LLC move to dismiss the claims against them pursuant to Fed. R. Civ. P. 12(b)(6). Defendants ACB Associates L.P. and Observer Media Digital, LLC adopt that motion and also move separately to dismiss the claims against them on the basis that they are improper defendants in this action.

For the reasons stated below, defendants' motions are denied.

## BACKGROUND

Plaintiff Wood is a professional photographer who provides residential retail and interior design photography services to clients through her sole proprietorship, Regan Wood Photography. Compl. ¶ 14. Wood charges and invoices these clients for the cost of her services, and further licenses her photographs for

-1-

use by such clients according to limitations specified under her written and oral license agreements. Id. Wood also licenses her photographs for uses on the Internet. Id.

Defendants Observer Holdings, LLC and The New York Observer, LLC operate and publish the digital media publication *Observer*, located at observer.com. Id. ¶¶ 3, 5. According to the complaint, defendant ACB Associates, L.P. ("ACB") also operates and publishes the digital media publication *Observer* and was formerly known as The New York Observer, L.P. until it changed its entity name. Id. ¶ 4. Defendant Observer Media Digital, LLC ("OMD") also allegedly operates and publishes the *Observer*. Id. ¶ 6. The complaint states that the four defendants (collectively, "Observer") have all "acted in concert in operating, publishing, and/or supplying content to be published in the digital media publication *Observer*." Id. ¶ 7.

In or around the summer of 2016, Compass, a licensed real estate broker and non-party to this action, engaged plaintiff's services for the creation of 33 photographs of a large estate in East Hampton, New York, known as the "Pond House". Id. ¶¶ 15-16. Wood registered the photographs (attached as Exhibit A) with the U.S. Copyright Office, with an effective registration date of September 26, 2017. Id. ¶ 17, Ex. B. She is the sole owner of the copyright in the photographs. Id.

As part of their agreement, Wood licensed the photographs to Compass for "the sole purpose of marketing the Pond House to

potential buyers of the estate". Id. ¶ 18. Before licensing or otherwise providing the photographs to Compass, and before any publication of the photographs, Wood embedded her Copyright Management Information ("CMI") in the photographs' metadata, including a copyright notice attributing to Wood authorship of, and ownership of the copyright in, the photographs. Id. ¶ 19; see also Ex. D (showing photographs' metadata).

Following the photoshoot of the Pond House, Wood provided Compass with copies of the photographs, each containing Wood's CMI, including the copyright notice. Id. ¶ 20. Compass subsequently displayed the photographs on its publicly accessible website, compass.com, pursuant to its nonexclusive license agreement with Wood. Id. ¶ 21.

In or around September 2017, the Pond House was sold to celebrity couple Beyoncé Knowles-Carter and Jay-Z. Id. ¶ 22. Following the sale, Wood's photographs were used by various publications in stories "having to do with the celebrity purchase, presumably to entertain their readers by illustrating the extravagance of the Pond House." Id. Defendants also published the photographs via their online media publication *Observer*, accessible at observer.com. Id. ¶ 23. Specifically, on September 25, 2017, Observer published an article titled, "Peek Inside Beyoncé and Jay-Z's Palatial New Georgica Pond Abode" (the "Article", attached as Exhibit C). Id. In the Article, Observer publicly displayed copies of 13 of the photographs of

-3-

the Pond House. Underneath each of the 13 photographs, Observer credited "Compass". Id. ¶ 27, Ex. C.

Plaintiff alleges that defendants have infringed her copyright in the photographs by reproducing, displaying and distributing the photographs in connection with the Article without plaintiff's permission or authorization and with knowledge of her copyright ownership. Id. ¶¶ 37-39. Plaintiff also alleges that defendants violated 17 U.S.C. §§ 1202(a) and 1202(b) by displaying false CMI in the gutter credit of the photographs and on the Terms page of its website and by altering the CMI contained in the metadata of plaintiff's photographs in the same manner. Id. ¶¶ 45-97.

**DISCUSSION**

On a motion to dismiss under Rule 12(b)(6), the court accepts all factual allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. Kelly-Brown v. Winfrey, 717 F.3d 295, 304 (2d Cir. 2013). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).

**COUNT I**

DIRECT COPYRIGHT INFRINGEMENT, 17 U.S.C. § 101, *ET SEQ*.

Defendants concede that plaintiff, by pleading it is the owner of a valid copyright in the photographs at issue and that

-4-

Observer published the copyrighted photographs, adequately pleads a prima facie case of copyright infringement. <u>See</u> Df. Br. at 6-7.

Defendants' only argument in support of their motion to dismiss the claim against them for direct copyright infringement is that their use is permitted by 17 U.S.C § 107, which allows the "fair use" of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research . . . .". 17 U.S.C § 107. Specifically, defendants argue that publishing the photographs in the Article which analyzes and comments on the purchase of the home and the features of the home for the purpose of reporting celebrity news constitutes fair use because it was "transformative" of the character and purpose of the photographs that were originally used for the "utilitarian" purpose of selling the real estate. <u>See</u> Df. Br. at 9.

## FAIR USE

"[T]he fair use determination is an open-ended and context-sensitive inquiry" <u>Cariou v. Prince,</u> 714 F.3d 694, 705 (2d Cir. 2013), but the statute provides a non-exclusive list of four factors that inform whether a given use is fair:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107; see also Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith, 992 F.3d 99, 109 (2d Cir. 2021).

### 1. Purpose and Character of the Use

"In considering the first statutory factor, . . . the primary inquiry is whether the use communicates something new and different from the original or [otherwise] expands its utility, that is, whether the use is transformative." Fox News Network, LLC v. Tveyes, Inc., 883 F.3d 169, 176 (2d Cir. 2018) (internal citation and quotation marks omitted) (alteration in original). "It is not enough for an image to be used in the course of news reporting; the use must be transformative." BWP Media USA, Inc. v. Gossip Cop Media, LLC, 87 F. Supp. 3d 499, 507 (S.D.N.Y. 2015).

Defendants' use of the photograph was not transformative.

Defendants have clearly made no visible changes to the photographs, so they have not aesthetically transformed the photographs. And while the use of an identical copyrighted photograph in a news article has been deemed transformative where the photograph itself is the subject of the news story,[1]

---

[1] See, e.g., Ferdman v. CBS Interactive Inc., 342 F. Supp. 3d 515 (S.D.N.Y. 2018) (use of a photograph in an article was "somewhat transformative" because the central subject of the article was the existence of, and commentary on, the Instagram photograph); Konangataa v. Am.

that is not the case here.

The use of the photographs in the Article communicates nothing new or different from their use in the real estate marketing materials: they show the house. Their "utility" is to display what was sold. They are given no new significance, they are seen from no new point of view, they have no enhanced meaning, and the perception of them is in no way transformed.

On the contrary, the photographs are used in the Article as illustrative aids for precisely the same reason they were created and are therefore not transformative. See, e.g., Barcroft Media, Ltd. v. Coed Media Grp., LLC, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017)(defendant's use of plaintiff's images was not fair where defendant's articles did not "comment on, criticize, or report news *about the Images themselves*; instead, they used the Images as illustrative aids because they depicted the subjects described in its articles.")(emphasis in original); BWP Media USA, Inc., 196 F.Supp.3d at 406 n.6 (S.D.N.Y. 2016)

---

Broadcastingcompanies, Inc., 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017)(news report using excerpts of and offering commentary on live-streamed video of someone giving birth was transformative); Nunez v. Caribbean International News Corp., 235 F.3d 18 (1st Cir. 2000)(news article commenting on provocative nature of photographs that were intended to be part of modeling portfolio was transformative); Boesen v. United Sports Publications, Ltd., 2020 WL 6393010, at *4 (E.D.N.Y. Nov. 2, 2020), reconsideration denied, 2020 WL 7625222 (E.D.N.Y. Dec. 22, 2020)(news article that embedded Instagram post announcing player's retirement and incidentally included the copyrighted photograph was transformative where "the fact that [Wozniacki] had disseminated" the Instagram post "was the very thing the Article was reporting on.")(quoting Walsh v. Townsquare Media, Inc., 2020 WL 2837009, at *4 (S.D.N.Y. June 1, 2020)).

("Defendant confuses the situation in which the *photograph* is the story ... and the scenario present here, in which the *contents* of the photograph are of some public interest.... Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.")(emphasis in original); Psihoyos v. Nat'l Exam'r, 1998 WL 336655, at *3 (S.D.N.Y. June 22, 1998)("The Examiner's use is not transformative, because its piece uses the photo to show what it depicts. It is clear from examining the Examiner's article that its purpose was not to comment on the Psihoyos' photo but to use it for precisely a central purpose for which it was created—to show how an art car looks.")(internal citation and quotation marks omitted).

Defendants argue that the use is transformative because they took photographs that were only intended to be used to "market[] the Pond House to potential buyers" and transformed them into "reporting on celebrity news". But what is important in the consideration of fair use is whether defendants "imbued the plaintiffs' photographs with new meaning by transforming them from their original intent . . . into the *subject* of a news story." McGucken v. Newsweek LLC, 464 F. Supp. 3d 594, 606 (S.D.N.Y. 2020)(emphasis added) (discussing Nunez, where plaintiffs' photographs were originally intended to appear in modeling portfolios, not in the newspaper, but were transformed

in an article discussing the controversy surrounding their risqué nature). They have not done so here.

The first factor also requires courts to consider whether the copyrighted materials are used for "a commercial purpose or for a nonprofit educational purpose, the former tending to weigh against a finding of fair use." TCA Television Corp. v. McCollum, 839 F.3d 168, 183 (2d Cir. 2016)(internal citation and quotation marks omitted). "[T]he less a use provides transformative value, the more its commercialism will weigh against a finding of fair use." Capitol Recs., LLC v. ReDigi Inc., 910 F.3d 649, 661 (2d Cir. 2018).

Defendants concede that "Observer's news website is conducted to some degree for profit, in the sense that the website generates advertising revenue in conjunction with published articles" but suggest that the revenue was insubstantial and therefore the link between the commercial gain and the copying is too attenuated. See Df. Br. at 10-11. The Second Circuit has recognized that "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit." Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 83 (2d Cir. 2014)(internal citation and quotation marks omitted).

The first factor also directs courts to consider the good or bad faith of a defendant, although "it generally contributes little to fair use analysis." Ferdman v. CBS Interactive, Inc.,

342 F. Supp. 3d 515, 531 (S.D.N.Y. 2018).

There is nothing in the pleadings to suggest whether defendants acted in good or bad faith. Therefore, this sub-factor is neutral. The fact that the publication was commercial weighs slightly but cumulatively against a finding of fair use.

### 2. Nature of the Copyrighted Work

The second fair use factor is "the nature of the copyrighted work." 17 U.S.C. § 107. This factor requires an analysis of "(1) whether it is expressive or creative, ... with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." Andy Warhol Found., 992 F.3d at 117. (internal citation and quotation marks omitted).

To some degree the photographs constitute creative works, as the staged photoshoot may have required the photographer to carefully arrange the subject and incorporate creative and aesthetic choices, but the photographs were published only to prospective buyers and on Compass's "publicly accessible website". Compl. ¶¶ 21, 24. Thus, this factor weakly favors defendants, but it "has rarely played a significant role in the determination of a fair use dispute." Andy Warhol Found., 992 F.3d at 117.

3. Amount and Substantiality of the Portion Used

The third fair use factor requires consideration of "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. Copying an entire copyrighted work does not necessarily cut in favor of or against fair use, and Court's must instead "take into account that the extent of permissible copying varies with the purpose and character of the use." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 613 (2d Cir. 2006)(internal citations and quotation marks omitted).

Defendants argue that they only selected 13 of the 33 photographs that were necessary to "give context to the news story regarding Jay-Z and Beyoncé's purchase of another lavish property." Df. Br. at 13-14. Plaintiff argues that defendants copied each individual photograph in its entirety and there was no justification for such copying, since defendants' stated purpose of using the photographs to give context on the home's purchase "could have been effectuated by using no photographs at all or any number of public domain photos depicting the same information." Pl. Br. at 24.

The third factor weighs against a finding of fair use.

4. Effect of Use on Potential Market for Copyrighted Work

The final factor in the fair use inquiry is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. "In assessing market harm,

-11-

we ask not whether the second work would *damage* the market for the first (by, for example, devaluing it through parody or criticism), but whether it *usurps* the market for the first by offering a competing substitute." Andy Warhol Found., 992 F.3d at 120 (emphasis in original).

Plaintiff alleges that she licenses photographs for use by "residential retail and interior design" clients, among others, and also licenses her photographs on the Internet. Compl. ¶ 14. The complaint also states that following the media interest in the Pond House, the photographs at issue were circulated on numerous third-party websites and online publications. Id. ¶ 22. Plaintiff states that defendants' actions deprived her of licensing revenue. Id. ¶ 33.

The burden is on defendants to prove there is no market usurpation. Andy Warhol Found., 992 F.3d at 121. Further, there is a presumption of market harm "when a commercial use amounts to mere duplication of the entirety of an original." McGucken, 464 F. Supp. 3d at 609 (quoting Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 591 (1994)). That presumption applies here, where, as noted in the Court's earlier discussion, defendants' use of the photograph was arguably commercial and wholly duplicative.

In sum, the Court finds that the first, third and fourth factors favor plaintiff, while the second slightly favors defendants. Under these circumstances, it is not possible to

conclude that defendants' use of the photographs was fair as a matter of law. Accordingly, defendants' motion to dismiss based on Observer's alleged fair use of the photographs is denied.

## **COUNTS II & III**

VIOLATIONS OF THE DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA")
17 U.S.C. §§ 1202(A)-(B)

Plaintiff also brings claims against Observer for the provision and/or distribution of false CMI and for the alteration of CMI.

Section 1202(a) of the DMCA makes its unlawful to "knowingly, and with the intent to 'induce, enable, facilitate, or conceal infringement,' either 'provide' or 'distribute' ... false 'copyright management information' or 'CMI.'" Aaberg v. Francesca's Collections, Inc., 2018 WL 1583037, at *6 (S.D.N.Y. Mar. 27, 2018) (quoting 17 U.S.C. § 1202(a)). Therefore, to state a claim under Section 1202(a), a plaintiff "must allege that the defendant both knew that the CMI was false, and provided or distributed the false CMI with the intent to induce, enable, facilitate, or conceal infringement." Trombetta v. Novocin, 2020 WL 1304120, at *4 (S.D.N.Y. Mar. 19, 2020) (internal citations and quotation marks omitted).

Section 1202(b) makes it unlawful to "intentionally remove or alter any copyright management information . . . knowing, or, with respect to civil remedies under Section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this

-13-

title." 17 U.S.C. § 1202(b). Accordingly, to state a valid claim under subsection 1202(b), a plaintiff must allege "1) the existence of CMI on the products at issue; 2) removal and/or alteration of that information; and 3) that the removal and/or alteration was done intentionally." Aaberg, 2018 WL 1583037, at *6.

For purposes of the Section 1202(a) claim, plaintiff adequately alleges that Observer's credit line attribution to Compass below each of the 13 photos constitutes CMI (regardless of whether or not there was a gutter credit to plaintiff in the original photograph). See Compl. ¶¶ 46-47, Ex. C; see also Hirsch v. Sell It Soc., LLC, 2020 WL 5898816, at *3 (S.D.N.Y. Oct. 5, 2020) (gutter credit positioned below the photo came within definition of CMI because it identified the author of the photo and was "conveyed in connection with" the photo). And since Compass is neither the author nor the copyright owner of the photographs, (see Compl. ¶ 48), defendants' CMI is false, even if, as defendants argue, Compass's website was its "source" of the photographs. See Df. Br. at 19.

The Terms and copyright notice, however, do not constitute CMI. According to the complaint, when accessing the "Terms" webpage via the Observer website, observer.com, Internet users are directed to a webpage on a separate website, observermedia.com., which states "All of the content featured or displayed on the website, including . . . photographs . . . is

-14-

owned by Company, its licensors and/or its content providers. . . . . The website, its content and all related rights shall remain the exclusive property of Company or its licensors unless otherwise expressly agreed." Id. ¶ 28 (quoting observermedia.com). The "Terms" page also includes a copyright notice stating, "All text, images, animation, videos, music, sounds, website design, graphics, text selections, arrangements, and all software are Copyright The New York Observer, L.P." Id. ¶ 29 (emphasis in original). Also appearing on the "Terms" webpage, but outside of the context of the enumerated "Terms" themselves is a separate copyright notice, stating, "©2020 Observer Media | All original photography shot for Observer." Id. ¶ 30.

Those boilerplate Terms and Conditions are accessed through a webpage on a separate website, and therefore were not "conveyed in connection with copies" of the work, as required by Section 1202(c).

For the purposes of the Section 1202(b) claim, Plaintiff sufficiently alleges that the information in the metadata embedded in the photographs listing plaintiff as the "Creator" of the work and providing a "copyright notice" to "Regan Wood Photography" constitutes CMI. See Compl. ¶ 26, Ex. D; see also Fischer v. Forrest, 2015 WL 195822, at *8 (S.D.N.Y. Jan. 13, 2015)(finding that information in metadata identifying the author of the work was a source of CMI). A reasonable person

could find that Observer's addition of the "Compass" credit below the photographs altered the pre-existing CMI in the metadata that identified plaintiff as the author and copyright holder, particularly given that defendants' gutter credit is more prominently displayed than plaintiff's CMI. See, e.g., Goldstein v. Metro. Reg'l Info. Sys., Inc., 2016 WL 4257457, at *9 (D. Md. Aug. 11, 2016) ("Particularly where [defendant]'s copyright mark was placed immediately before [plaintiff]'s copyright mark and used more recent dates, that mark could be construed as trumping, diluting, or superseding, and thus altering, [plaintiff]'s CMI.").

With respect to the scienter elements of both the § 1202(a) and § 1202(b) claims, plaintiff alleges that "Although each and every copy of the Photographs Observer used contained Wood's copyright notice, and Observer therefore possessed knowledge of the name of the author/owner(Wood) and the copyright status of the Photographs, Observer nonetheless altered Wood's CMI and provided and/or distributed false CMI in connection with the Photographs by erroneously crediting Compass as the author/owner in connection with each of the 13 copies" and that "On information and belief, Defendants committed the acts described herein with the intent to induce, enable, facilitate, and/or conceal infringement." Compl. ¶¶ 27, 61.

Although the allegations here do not show actual knowledge of falsity, such facts need not be alleged at this stage. See

-16-

Aaberg, 2018 WL 1583037, at *9 ("The Second Circuit has stated that courts should be lenient in allowing scienter issues to survive motions to dismiss.") (citing In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 693 (2d Cir. 2009)). A plausible inference can be drawn from the allegations that defendants had access to and thereafter discovered the name of the owner and author of the photographs but disregarded such information and provided false attribution in order to intentionally conceal an infringement. See, e.g., Mango v. BuzzFeed, Inc., 356 F. Supp. 3d 368, 378 (S.D.N.Y. 2019), aff'd, 970 F.3d 167 (2d Cir. 2020)("[A]ltering the gutter credit to include a false attribution to Fisher's law firm would have wrongfully implied that BuzzFeed had permission to use the Photograph, thus concealing its infringement."). Whether defendants in fact acted with the requisite scienter will need to be proven at a later stage.

## ISSUE OF IMPROPER DEFENDANTS

Defendants ACB and OMD also move to dismiss the claims against them on the basis that they are not the proper defendants and that plaintiff has not sufficiently connected them to the conduct at issue.

However, plaintiff's allegations plausibly suggest that ACB and OMD are involved with Observer's corporate structure and that all of the named defendants have worked in concert to infringe her copyright in the photographs and to falsify and

-17-

alter her CMI. See Compl. ¶¶ 4, 6, 7. Therefore, the Court cannot find that they are improperly joined in the action as a matter of law, and discovery will determine whether one or more parties should be dismissed.

## CONCLUSION

Defendants' motions to dismiss are denied.

So Ordered.

Dated:   New York, New York
         July 8, 2021

*Louis L. Stanton*
Louis L. Stanton
U.S.D.J.